# UNITED STATES DISTRICT COURT
### for the
### Middle District of Tennessee

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 26-mj-2123 |
| Maikel Jesus Albornoz-Jimenez | ) | |
| Eduard Jesus Velasquez-Matute | ) | |
| Faren Aldahir Marquez-Cruz | ) | |
| Jose Luis Baza-Rodriguez | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____See Attachment C_____ in the county of _____See Attachment C_____ in the _____Middle_____ District of _____TN and elsewhere_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Drug Trafficking Conspiracy |
| 18 U.S.C. 924(c) | Using and Carrying a Firearm During and In Relation to a Drug Trafficking Offense |
| 18 U.S.C. 933 | Firearms Trafficking Conspiracy |

This criminal complaint is based on these facts:

See Attachment C

☑ Continued on the attached sheet.

/s/ Joseph Dizeo
*Complainant's signature*

Joseph Dizeo, HSI Special Agent
*Printed name and title*

Sworn to me remotely by telephone, in compliance with Fed. R. Crim. P. 4.1.

Date:  April 28, 2026

*Judge's signature*

City and state:  Nashville, Tennessee

U.S. Magistrate Judge James P. O'Hara
*Printed name and title*

**ATTACHMENT C**

**Statement in Support of Criminal Complaint**

1. I, Joseph Dizeo, Special Agent of the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI") have served in this capacity since September 2021, being duly sworn, depose and state that I am a Special Agent currently assigned to Nashville, Tennessee. I was previously assigned with HSI in Deming, New Mexico for more than (3) years. I received specialized training at the Federal Law Enforcement Training Center regarding federal criminal statutes, including Title 8, Title 18, Title 19, Title 21, and Title 26 of the United States Criminal Code. I received a bachelor's degree in law enforcement and justice administration from Western Illinois University in Macomb, Illinois. In total, I possess more than (4) years of law enforcement experience. During my career as a federal law enforcement officer, I have conducted numerous criminal investigations and operations relating to violations of the Controlled Substances Act, federal firearms offenses, and other crimes, and have received ongoing training in conducting such investigations. Finally, I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2507(7).

2. I make this Statement in Support of an Application for a Criminal Complaint charging Maikel Jesus ALBORNOZ-Jimenez ("ALBORNOZ"), Eduard Jesus VELASQUEZ-Matute ("VELASQUEZ"), Faren Aldahir MARQUEZ-Cruz ("MARQUEZ"), and Jose Luis BAZA-Rodriguez, a/k/a "Yonce" ("BAZA") because there is probable cause to believe:

a. ALBORNOZ has committed violations of Title 21, United States Code, Sections 841 and 846 (Drug Trafficking Conspiracy Involving More than 500 Grams of Cocaine and Other Controlled Substances), Title 18, United States Code, Section 924(c) (Using and Carrying a Firearm During and In Relation to a Drug Trafficking Crime), and Title 18,

United States Code, Section 933 (Firearms Trafficking Conspiracy);

b. VELASQUEZ and MARQUEZ have committed violations of Title 18, United States Code, Section 933 (Firearms Trafficking Conspiracy); and

c. BAZA has committed a violation of Title 21, United States Code, Sections 841 and 846 (Drug Trafficking Conspiracy Involving More than 500 Grams of Cocaine and Other Controlled Substances).

3. I base the information in this Statement on my personal knowledge and on information that I have learned, either directly or indirectly, from witnesses, records, and other sworn law enforcement officers and agents. Additionally, unless otherwise indicated, conversations discussed herein are described in substance and part rather than verbatim. Likewise, I have not included each and every fact that my investigation has revealed. Instead, I have included only those facts necessary to show probable cause.

## PROBABLE CAUSE

4. Since approximately September 2025, the United States, including HSI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); the Federal Bureau of Investigation; and other federal, state, and local law enforcement officials (hereinafter referred to collectively as "Agents") have been investigating ALBORNOZ, VELASQUEZ, MARQUEZ, BAZA, and others known and unknown, for trafficking in firearms and narcotics throughout the Middle District of Tennessee ("MDTN") and elsewhere.

5. ███████████████████████ introduced ALBORNOZ to a Nashville undercover agent ("UCA") and other undercover agents, and as part of this investigation and other

2

investigations, HSI, ATF, and other law enforcement agencies conducted multiple undercover operations—all of which are audio and/or video recorded—that have resulted in the seizure of firearms, narcotics, and the identification of potential individuals involved in prostitution and/or sex trafficking in the MDTN and elsewhere.

6. Additionally, over the course of the investigation, Agents identified ALBORNOZ as a facilitator of deals across the country, meaning that ALBORNOZ would often connect ███ and others with individuals in other states that ALBORNOZ knew had firearms or narcotics available for sale. ███ would then introduce ALBORNOZ to other undercover agents across the country, and ALBORNOZ would facilitate deals between his co-conspirators in other districts and the undercover agents. ALBORNOZ would often be on Facetime (or some other call) before, during, and/or after the transactions. And ALBORNOZ would often receive a kickback of some sort for facilitating the deal. Throughout this investigation, ███ maintained regular contact with ALBORNOZ, BAZA, and other targets of the Nashville investigation and other investigations across the United States.

7. Based on this investigation, which includes evidence recovered from cloud warrants, phone toll analysis, and witness statements, as well as my training, experience, and review of law enforcement reports, Agents believe ALBORNOZ and BAZA may be associates of Tren De Aragua ("TdA"), a trans-national criminal organization from Venezuela that has been designated as a Foreign Terrorist Organization by the United States on or about February 20, 2025, and/or associates of a TdA splinter faction known as "Anti-Tren"—comprised of current and former members of TdA who are operating without or against the authority of TdA leadership in Venezuela. Members of TdA and Anti-Tren have been identified and arrested across the United States, including in Colorado, Tennessee, New York, Florida, Illinois, New Mexico, Washington,

3

Georgia, and elsewhere.  Members of TdA and Anti-Tren have also been known to engage in gun trafficking, drug trafficking—particularly in "Tusi", burglaries of ATM machines (also known as "ATM jackpotting"), and to coordinate their criminal activities with each other across state lines and with leaders located in South America, including Venezuela and Colombia.

8. For example, during a recorded call on January 26, 2026, BAZA and ▮ discussed an upcoming purchase of drugs/guns being arranged by BAZA.  BAZA and ▮ also discussed Venezuelan gangs, and BAZA told ▮ that the primary Venezuelan gang in Denver at that time was "Choo-Choo"—which BAZA believed was "Anti-Tren." Based on my training and experience, "Anti-Tren" is a splinter faction of TdA comprised of current and former members of TdA. Similarly, during a recorded call on February 9, 2026, BAZA told ▮ that he has "brothers" in various states around the country.  When asked if BAZA is part of TdA, BAZA told ▮ that his "brothers" are "Anti"—which, based on the context of the calls between ▮ and BAZA, I believe to be a reference to the "Anti-Tren" splinter faction of TdA. BAZA also advised ▮ that if he goes to Venezuela to meet the organization, BAZA can ensure that ▮ will receive a warm welcome and will be put in touch with the "alta gama," which I believe may refer to the organization's leadership because "alta gama" translates to "high-end."

9. Additionally, in ALBORNOZ's Apple iCloud return, Agents observed a picture of ALBORNOZ wearing what appears to be a Fuerzas de Acciones Especiales de la Policía Nacional Bolivariana ("FAES") uniform. The FAES was a special action police force that acted in coordination with former Venezuelan President Maduro, the Colectivos, and TdA. The FAES conducted operations against the Venezuelan people who opposed the Venezuelan government and its illicit activities.  The image is set forth below:

4



10. The ALBORNOZ Apple iCloud return also included two social media screenshots with a lengthy letter that begins "Hey anti tren" that appears to be drafted by one or more members of a rival group that is displeased with how members of Anti-Tren have been representing themselves publicly. This supports law enforcement's belief that ALBORNZO himself appears to be affiliated with either TdA or Anti-Tren. The two images, along with

5

translations from Spanish to English, are set forth below:



Based on a review of the above image by an FBI Spanish-speaking linguist, the above image

states as follows:

> Hey, Anti Tren, you've got the calculation down. If someone commits a crime and you're the one they're targeting, and you know the ropes, you know you can't just go around calling people names pajuo. Second, don't go around calling yourself the hampa of Venezuela and speaking for everyone who is actually in Venezuela—which are the brothers in prison and us—because together we're many who make the decisions. Learn from experience: you know you shouldn't be calling out the brother and talking trash in Venezuela. We all know who the two gangs are, the ones that shooting at guys and kill people, and the bad guys from CCS—we heard from Koki, they know who they are—my respects, Brother. Those are the ones who can call themselves the CCS underworld, the ones hanging with Richardi's "Naranjas Dulces"—you're the ones with the stains, the Anti-Tran "Naranjas Dulces" of Venezuela.



Based on a review of the above image by an FBI Spanish-speaking linguist, the above image states as follows:

> Speaking bluntly, CCS is CCS, and as for Monte and Culebra, you don't even have a dialect as far as I know. We were the ones who founded the "malandreo" in Central Venezuela as the first gang armed with rifles, turning "Los Verdes" and sending the cops running—we were the "Tren del Llano," the leading force, and we've been in the game since 2011, without stopping the wars with those guys, so don't talk about the states of Venezuela, you poor paper-witch who I don't think even knows when the routine started, from the Flores de Catia to this day, and here in Venezuela, to those who don't get it and the "Naranjas Dulce", know this: the prisoners and the llaneros and the ARGA guys and Koki's ugly ones—we're the ones who say who's a brother and who isn't.

> Att. El Tran del Llano

11.     Additionally, according to an analysis of WhatsApp data, ALBORNOZ is involved in multiple chat groups with criminal associates in the United States, as well as with individuals who are believed to be based in Colombia and Venezuela based upon IP logs and

7

latitude/longitude coordinates associated with the phone numbers appearing in the chat groups. Among ALBORNOZ's group chat contacts and criminal associates, E.M.P. ("EMP"), arrived at a controlled buy of cocaine brokered by ALBORNOZ on or about January 14, 2026, in Denver, Colorado, as discussed in more detail below. Less than two weeks later, EMP was later arrested for ATM jackpotting in the Western District of Oklahoma.

12. And two firearms recovered in this investigation, one of which was sold by G.Y. ("GY") to an undercover agent during a deal brokered by ALBORNOZ on or about January 21, 2026, as discussed in more detail below have been linked back to a string of FFL burglaries committed in Colorado in December 2025. As noted below, at least one suspect involved in the FFL burglaries stated in a custodial interview that the FFL burglaries were ordered by a person who the suspect identified as a member of TdA in Denver.

**A. Seizure of 112 grams of Tusi from ALBORNOZ on September 11, 2025:**

13. On or about September 11, 2025, at approximately 2:10 p.m., ALBORNOZ met with UCA to facilitate the purchase of four ounces of Tusi in exchange for $5,600. I know from my training and experience that Tusi consists of controlled substances.

14. ALBORNOZ arrived at the meeting location—which occurred in a Walmart parking lot in Nashville, Tennessee—in a Hyundai Elantra bearing Tennessee license plate number BTJ5996. Agents observed ALBORNOZ walk over to and enter UCA's vehicle. ALBORNOZ sold UCA a pink powdery substance in two clear plastic bags in exchange for $5,000. This transaction was consistent with what was previously negotiated between UCA and ALBORNOZ. The parties discussed a future firearms transaction. Agents observed ALBORNOZ exit UCA's vehicle and depart the area. According to DEA lab analysis, the Tusi that ALBORNOZ provided tested positive for Ketamine, 3,4-Methylenedioxymethamphetamine MDMA, and Caffeine, with a net weight of approximately 112.39. Ketamine, and 3,4-

8

Methylenedioxymethamphetamine MDMA are controlled substances.

**B.  Purchase of Two Firearms from ALBORNOZ on October 1, 2025:**

15.     On or about October 1, 2025, at approximately 12:13 p.m., ALBORNOZ met with UCA to sell two firearms in exchange for $2,000.

16.     ALBORNOZ arrived at the meeting location—a Walmart store located in Nashville, Tennessee—in a Hyundai Elantra bearing Tennessee license plate number BTJ5996. Agents observed ALBORNOZ, carrying a box, walk over to and get in UCA's vehicle. While inside the vehicle, ALBORNOZ gave UCA the box, which contained two firearms. In exchange, UCA gave ALBORNOZ $2,000. During the exchange, UCA advised ALBORNOZ that he was felon and could not purchase the firearms at a regular store. ALBONROZ then proceeded to show UCA a picture of a Glock for sale before exiting UCA's vehicle and departing the area.

17.     The two firearms purchased by UCA on October 1, 2025, were: 1) a tan Sig Sauer, Model: P320/M18, Caliber: 9x19mm, pistol, bearing serial number M18A225455; and 2) a black Glock [GMBH], Model: 23Gen 4, Caliber: .40, pistol, bearing serial number VCN928. Both firearms were examined by an ATF Nexus Expert, and neither firearm was manufactured in the State of Tennessee, which means that both firearms had traveled in interstate or foreign commerce before being recovered in the Middle District of Tennessee.  Additionally, the tan Sig Sauer P320 pistol was previously reported stolen. Finally, based upon NIBIN results, the Glock pistol is preliminarily associated with a non-lethal shooting from November 30, 2023.

**C.  Purchase of Four Firearms from ALBORNOZ and VELASQUEZ on October 3, 2025:**

18.     On or about October 3, 2025, at approximately 12:52 p.m., ALBORNOZ and VELASQUEZ met with UCA to facilitate the purchase of four firearms in exchange for $4,000.

19.     ALBORNOZ arrived at the original meeting location—a Walmart located in the

9

MDTN—in a Hyundai Elantra bearing Tennessee license plate number BTJ5996. Agents observed ALBORNOZ walk over to and enter UCA's vehicle. While inside the vehicle, ALBORNOZ informed UCA that he did not have the firearms in his possession but that his associates, one of whom was later identified as VELASQUEZ, were on their way. Shortly thereafter, ALBORNOZ received a call from VELASQUEZ to move over to the Pollo Campero parking lot to conduct the transaction. The Pollo Campero parking lot is located next to the Walmart. Agents then observed a Toyota Corolla bearing Tennessee license plate number 388BQFY occupied by VELASQUEZ and two other male subjects and a Dodge Charger parked next to the Toyota Corolla.

20. UCA, with ALBORNOZ as a passenger, moved his vehicle to the Pollo Campero parking lot. ALBORNOZ informed UCA to stay inside the vehicle while he met with his associates. Minutes later, ALBORNOZ and VELASQUEZ, carrying a backpack, walked towards the direction of UCA's vehicle. VELASQUEZ gave the backpack to ALBORNOZ and waited behind UCA's vehicle. ALBORNOZ then removed four firearms from the backpack and gave them to UCA. In exchange, UCA paid ALBORNOZ $4,000.

21. On or about October 9, 2025, Agents reviewed surveillance footage from Pollo Campero related to the October 3, 2025, transaction discussed above. Agents observed the Corolla parked next to the white Dodge Charger. Shortly after the two vehicles parked next to each other, agents observed VELASQUEZ exit the Corolla, retrieve a backpack from the passenger rear of the Dodge Charger, and re-enter the Corolla. Minutes later, ALBORNOZ walked over to the Corolla and conversed with an unidentified male in the passenger seat. During this time, VELASQUEZ, carrying a backpack, got out of the driver's side of the Corolla and walked around the car and met with ALBORNOZ. ALBORNOZ and VELASQUEZ then walked out of view towards the direction of UCA's vehicle.

22.     The four firearms purchased by the Nashville UC on October 3, 2025, were: 1) a Smith & Wesson, Model: M&P 9 M2.0, Caliber; 9x19mm, pistol, bearing serial: NLP3381; 2) a Kimber, Model: Custom II, Caliber: .45 ACP, pistol, bearing serial: K483527; 3) a Taurus Armas, Model: G2c, Caliber: 9x19mm, pistol, bearing serial: ACM679750; and 4) a Smith & Wesson, Model: M&P 9 Shield, Caliber: 9x19mm, pistol, bearing serial: HLZ3287. All four firearms were examined by an ATF Nexus Expert, and none was manufactured in the State of Tennessee, which means that the firearms had traveled in interstate or foreign commerce before being recovered in the Middle District of Tennessee. Additionally, both Smith & Wesson pistols and the Kimber pistol had all previously been reported stolen.

### D.  Purchase of One Firearm and 84 Grams of MDMA from ALBORNOZ on October 10, 2025:

23.     On or about October 10, 2025, at approximately 12:18 p.m., ALBORNOZ met with UCA to facilitate the purchase of three ounces of crystalized MDMA and one firearm in exchange for $3,400.

24.     ALBORNOZ arrived at the meeting location—a Walmart parking lot in Nashville, Tennessee—in a Toyota Corolla bearing Florida license plate number RBYD21. Agents observed ALBORNOZ walk over to and enter UCA's vehicle. While inside the vehicle, ALBORNOZ gave UCA a Sig Sauer Pistol and a clear plastic bag containing a crystallized substance. UCA then paid ALBORNOZ $3,400. UCA told ALBORNOZ that he was getting the firearms for Mexico. They also discussed future deals for "rifles" as well as "girls." ALBORNOZ then departed the area.

25.     The firearm purchased by UCA on October 10, 2025, is a Sig Sauer, Model: P320 M18, Caliber 9x19mm, pistol, bearing serial number M18A088202. The firearm was examined by an ATF Nexus Expert and determined not to have been manufactured in the State of Tennessee, which means that the firearms had traveled in interstate or foreign commerce before being

11

recovered in the Middle District of Tennessee. The seized crystalized substance weighed approximately 84 grams. Agents conducted field test analysis and determined the substance tested presumptive positive for opiates and methamphetamine.

**E. Purchase of Five Firearms from ALBORNOZ and VELASQUEZ on November 10, 2025:**

26. On or about November 10, 2025, in the afternoon, ALBORNOZ and VELASQUEZ met with UCA to facilitate the purchase of five firearms in exchange for $5,000.

27. ALBORNOZ arrived at the agreed upon meeting location—a Walmart in Nashville, Tennessee—in a Hyundai Elantra bearing TN license plate number BTJ5996. Agents observed ALBORNOZ walk over to and enter UCA's vehicle. While inside the vehicle, VELASQUEZ, who was communicating with ALBORNOZ via telephone, told ALBORNOZ to meet at 4700 Humber Drive, Nashville, Tennessee, to conduct the firearms transaction. UCA, accompanied by ALBORNOZ, drove to an apartment complex located at 4700 Humber Drive, Nashville, Tennessee, where VELASQUEZ was present. Agents observed a Nissan Rogue, bearing Tennessee license plate number BPN6004, arrive at the location and park in the area. Agents observed VELASQUEZ walk over to the Nissan Rogue and enter the rear passenger seat while carrying a backpack. Minutes later, VELASQUEZ exited the Nissan Rogue and exchanged a backpack with ALBORNOZ who subsequently handed the backpack, which contained four firearms, to UCA.

28. ALBORNOZ informed UCA that the fifth gun was on the way and would arrive in approximately 10 minutes. During this time, UCA retrieved $5,000 and handed it to ALBORNOZ who then gave the money to VELASQUEZ. Minutes later, a silver Nissan Altima, bearing Tennessee license plate number 372BPGH, arrived at the location and parked in front of the Nissan Rogue. An unidentified male exited the driver's side rear door and walked over to the

12

Nissan Rogue and gave a firearm to VELASQUEZ who then transferred the firearm to ALBORNOZ. ALBORNOZ then gave the firearm to UCA.

29.     The five firearms purchased by UCA on November 10, 2025, were: 1) a HS Product (Springfield Armory), Model: Hellcat, Caliber: 9x19mm, pistol, bearing serial number BE197499; 2) an Armscor of the Philippines (Rock Island Armory), Model: M1911 A1, Caliber: .45 ACP pistol, bearing serial number RIA1785056; 3) Smith & Wesson, Model: 380 Shield EZ, Caliber: .380 Auto, pistol, bearing serial number RHV2461; 4) a Taurus Armas, Model: G3c, Caliber: 9x19mm, pistol, bearing serial number ADA839717; and 5) Glock [GMBH], Model: 48, Caliber: 9x19mm, pistol, bearing serial number BLGT892. All five firearms were examined by an ATF Nexus Expert, and none was manufactured in the State of Tennessee, which means that the firearms had traveled in interstate or foreign commerce before being recovered in the Middle District of Tennessee. Two of the firearms—HS Product (Springfield Armory), Model: Hellcat pistol and the Glock [GMBH], Model: 48, pistol—were previously reported stolen.

**F.    Purchase of Four Ounces of Cocaine from ALBORNOZ and BAZA on December 22, 2025:**

30.     In December 2025, ALBORNOZ was in contact with a ▮▮ who was traveling to Washington State. During those communications, ALBORNOZ advised ▮▮ that he had a contact in Washington that could sell cocaine to ▮▮ The communications between ▮▮ and ALBORNOZ were recorded. Both ▮▮ and UCA can identify ALBORNOZ's voice as the individual speaking to ▮▮ in the audio recordings. ALBORNOZ put ▮▮ in contact with BAZA through WhatsApp to facilitate the narcotics' deal.

31.     On December 22, 2025, ▮▮ and a Yakima ATF UC ("Yakima UC") traveled to an address in Richland, Washington, which had been provided to ▮▮ by BAZA, to purchase four ounces of cocaine. Once Yakima UC and ▮▮ arrived at the location, two other vehicles arrived—

13

a blue Jeep Cherokee driven by BAZA and a Nissan SUV driven by Colombian national J.U. ("JU"). BAZA walked over Yakima UC's vehicle and obtained an advance partial payment of $900. BAZA then walked over to the Nissan, occupied by JU, obtained one ounce of cocaine, and walked back over and provided the ounce to the Yakina UC. Yakima UC weighed the cocaine and it weighed approximately 30 grams. This process was repeated for a second ounce of cocaine.

32.     After Yakima UC received the second ounce of cocaine, ▮ called BAZA and advised that Yakima UC wanted to obtain an additional two ounces and asked if JU would sell it to him at a discount. BAZA called ▮ back and advised that JU would have to run home and break off an additional two-ounce chunk from a brick at home as JU did not have any additional cocaine in his possession. Additionally, BAZA advised JU would sell the additional two ounces for $800 per ounce.

33.     Once JU returned, Yakima UC provided BAZA with $1,800. BAZA then walked over to JU's Nissan, obtained the additional cocaine, and returned to Yakima UC's vehicle where he handed it to Yakima UC. Yakima UC weighed the chunk of cocaine, and it weighed approximately 60 grams.

34.     According to DEA lab analysis, the white substance seized on December 22, 2025, tested positive for Cocaine Hydrochloride, with a total net weight of approximately 111.6 grams.

35.     Based upon communications with ▮ ALBORNOZ wanted to be paid $300 for facilitating/brokering this transaction. ALBORNOZ had previously provided payment information to ▮ which included the name C.D. ("CD"). Agents know CD to be a Venezuelan female located in Nashville, Tennessee, who appears in multiple photographs recovered from ALBORNOZ's Apple iCloud. The following day, on or about December 23, 2025, Agents sent $300 to ALBORNOZ at the requested account.

14

36.     Between January 14, 2026, and the present, BAZA has sold or been involved with selling additional amounts of cocaine to Yakima UC, ███ and/or others working on law enforcement's behalf in and around Yakima, Washington. For example, on or about January 14, 2026, ATF Yakima agents conducted an undercover operation in which Yakima UC and another undercover agent purchased approximately 119 grams, gross weight, of cocaine from BAZA and JU. According to DEA lab analysis, the white substance tested positive for Cocaine Hydrochloride, with a net weight of approximately 112.1 grams.

37.     Additionally, on or about March 5, 2026, ATF Yakima conducted an undercover operation in which Yakima UC and another undercover agent purchased approximately two ounces of cocaine from BAZA and another individual—I.P. ("IP"). According to DEA lab analysis, the white substance tested positive for Cocaine Hydrochloride, with a net weight of approximately 56 grams.

38.     Finally, on or about April 7, 2026, ATF Yakima conducted an undercover operation in which Yakima UC and another undercover agent purchased approximately nine ounces of cocaine from BAZA and JU in exchange for $6,700. The white substance field-tested positive for Cocaine Hydrochloride, with a weight of approximately 258.9 grams.

39.     Accordingly, there is probable cause to believe that law enforcement has seized approximately 537.9 grams of cocaine hydrochloride in total from narcotics' transactions involving BAZA.

**G. Purchase of Five Firearms from ALBORNOZ, VELASQUEZ, and MARQUEZ on January 13, 2026:**

40.     On or about January 13, 2026, in the afternoon, ALBORNOZ, VELASQUEZ, and MARQUEZ met with UCA and another undercover agent ("UCA2") to facilitate the purchase of five firearms in exchange for $5,800. In the days leading up to January 13, 2026, ALBORNOZ

15

sent multiple photographs of firearms to UCA during discussions about the upcoming deal.

41.     ALBORNOZ arrived at the agreed upon meeting location—a Walmart in Nashville, Tennessee—in a Hyundai Elantra bearing Tennessee license plate number BTJ5596 and got into UCA's vehicle. UCA, UCA2, and ALBORNOZ drove to an apartment complex located at 180 Wallace Rd, Nashville, Tennessee—an address provided by VELASQUEZ to ALBORNOZ.

42.     Shortly thereafter, a black Infiniti Q50, bearing TN license plate number BTB4176 and occupied by three individuals, VELASQUEZ, MARQUEZ, and an unknown Hispanic male, arrived at the location. VELASQUEZ was seated in the back seat of the Infiniti and MARQUEZ was in the driver's seat. ALBORNOZ exited UCA's vehicle and got into the driver's side backseat of the Infiniti. UCA observed a large bag in the Infiniti's backseat.

43.     A few minutes later, ALBORNOZ got back into the passenger seat of UCA's vehicle with a black Under Armour duffel bag. UCA passed the bag to UCA2 who observed that there were five firearms in the bag—three handguns and two long guns. UCA then paid $5,800 to ALBORNOZ who then took the money and got back into the black Infiniti Q50. UCA observed VELASQUEZ and ALBORNOZ counting the funds in the backseat of the Infiniti. After counting the money, ALBORNOZ handed the money to MARQUEZ who proceeded to count the money again before placing it in the Infiniti's center console. At this time, MARQUEZ departed the location.

44.     The five firearms purchased by UCA on January 13, 2026, were: 1) a Sig Sauer, Model: P320, Caliber: 9x19mm, pistol, bearing serial number 58C454966; 2) a Beretta, Pietro, S.P.A., Model: APX Centurion, Caliber: 9x19mm, pistol, bearing serial number: A162037X; 3) a Sig Sauer, Model: P365, Caliber: 9x19mm, pistol, bearing serial number: 66B936719; 4) a Romarm/Cugir, Model: Micro Draco, Caliber: 7:62x39mm, pistol, bearing serial number: 24

PMD-66330; and 5) a Bear Creek Arsenal, Model: BCA15, Caliber: Multi, pistol, bearing serial number: A12608. All five firearms were examined by an ATF Nexus Expert, and none was manufactured in the State of Tennessee, which means that the firearms had traveled in interstate or foreign commerce before being recovered in the Middle District of Tennessee. One of the firearms—Sig Sauer, Model: P365 pistol— was previously reported stolen.

**H. Purchase of Five Firearms and Cocaine from ALBORNOZ on March 24, 2026:**

45. On or about March 24, 2026, at approximately 2:29 p.m., ALBORNOZ, VELASQUEZ, and MARQUEZ met with UCA to facilitate the purchase of five firearms and approximately four grams of cocaine in exchange for $5,750.

46. ALBORNOZ arrived at the agreed upon meeting location—a Walmart in Nashville, Tennessee—in a Hyundai, bearing temporary Tennessee license plate number Q7MM6QY, walked over to and entered UCA's vehicle. While inside UCA's vehicle, ALBORNOZ pulled out a Browning 9mm handgun from a box and handed it to UCA. ALBORNOZ then took a white powdery substance, which he referred to as "blanco," that was wrapped in white cellophane wrapping from the box and handed it to UCA. UCA paid ALBORNOZ $1,100 for the firearm and the cocaine. Shortly after, ALBORNOZ received a message from VELASQUEZ identifying 4700 Humber Dr, Nashville, Tennessee, as the location for the additional firearms exchange.

47. UCA, accompanied by ALBORNOZ, drove to the apartment complex located at 4700 Humber Dr, Nashville, Tennessee. At approximately 3:30 p.m., a Honda Civic bearing Tennessee license plate number 702BQHW, occupied by MARQUEZ and an unidentified male, arrived at the meeting location. VELASQUEZ also arrived at the meeting location in a Toyota Corolla bearing Tennessee license plate 388BQFY. ALBORNOZ exited the UCA's vehicle, retrieved the firearms from MARQUEZ's vehicle, and walked back toward the UCA's vehicle while carrying a blanket.

17

48. ALBORNOZ got into the backseat of UCA's vehicle. Underneath the blanket, UCA observed three AR-15 style firearms. ALBORNOZ stated that his people only had three "large ones" and one additional "small one." UCA inquired what happened to the other two "large ones" to which ALBORNOZ replied that they sold the other two. During this time, UCA and ALBORNOZ exited the vehicle and walked across the parking lot to the Corolla, which was parked next to the Honda Civic. ALBORNOZ got into the front passenger seat of the Corolla and UCA got into the driver's side backseat of the Corolla.

49. VELASQUEZ got out of the Honda Civic and into the driver's seat of the Corolla. VELASQUEZ removed a Canik pistol from his person, started wiping the firearm with a cloth, and handed it to UCA. I believe VELASQUEZ did this in an effort to remove any fingerprints or DNA from the firearm. UCA then paid VELASQUEZ $4,650 for the firearms. After UCA and ALBORNOZ exited the Corolla, the Honda Civic and Corolla departed the meeting location.

50. Agents conducted surveillance on the Civic occupied by MARQUEZ and an unidentified Hispanic male after the firearms transaction was completed. MNPD officers traveling in unmarked vehicles attempted a vehicle stop on the Honda Civic. The Honda Civic fled to an address located at Ocala Dr in Antioch, Tennessee. Once at this address, MARQUEZ and the unidentified male threw miscellaneous items out of the vehicle and into the backyard before fleeing on foot.

51. The five firearms purchased by UCA on March 24, 2026, were: 1) a Canik, Model: TP-9, Caliber: 9x19mm, pistol, bearing serial number: 21BN23954; 2) a Browning Arms Company, Model: BDM, Caliber: 9x19mm, pistol, bearing serial number: 945NX04678; 3) a Palmetto State Armory, Model: PA-15, Caliber: Multi, pistol, bearing serial number: SCD456818; 4) a Springfield Armory, Model: Saint, Caliber: Multi, pistol, bearing serial number: ST216016;

18

and 5) CMMG Inc., Model: MK-3, Caliber: .308, rifle, bearing serial number: MDO02924. All five firearms were examined by an ATF Nexus Expert, and none was manufactured in the State of Tennessee, which means the firearms had been transported in interstate or foreign commerce before being recovered in the Middle District of Tennessee. One of above-mentioned firearms— CMMG Inc. rifle—was reported stolen. Additionally, based upon NIBIN results, the Canik 9x19mm pistol is preliminarily associated to a non-lethal shooting that occurred on Mount View Road on or about September 17, 2024.

52. The white powdery substance field-tested positive for cocaine and weighed approximately four grams.

## I. Other Narcotic and Firearm Deals Brokered and Facilitated by ALBORNOZ:

53. As stated above, during the course of this investigation, ALBORNOZ has been identified by law enforcement as the primary target coordinating, facilitating, and engaging in illicit firearms and narcotics transactions across the country between the fall of 2025 and the present. The following is a brief summary of some of the other deals in which ALBORNOZ has been involved:

    a. Between on or about October 1, 2025, and on or about October 6, 2025, ███ engaged in communications with ALBORNOZ regarding ALBORNOZ's associates in the Denver and Aurora areas having firearms available for sale. On or about October 7, 2025, a Denver ATF undercover agent ("Denver UC") and ███ purchased one firearm—a Glock Model:42, caliber: .380 pistol with an obliterated serial number—from two of ALBORNOZ's associates, J.B. ("JB") and W.B. ("WB"), in exchange for $1,100. During the actual exchange of the firearm, ███ was on speakerphone with ALBORNOZ who was providing directions to JB and WB.

    b. On or about October 23, 2025, the ███ communicated with ALBORNOZ

about purchasing one firearm from WB, ALBORNOZ's associate, in exchange for $1,200. That same day, ATF Denver conducted an undercover operation in which the Denver UC and ███ purchased one firearm—an Armscor off the Philippines (Squires Bingham), Model Charles Daly .45 caliber pistol, bearing serial number CD014473. Following the deal, ███ placed a video call with ALBORNOZ over WhatsApp, which was witnessed by the Denver UC. During the call, ███ and Denver UC discussed purchasing additional firearms from ALBORNOZ who advised that he had three firearms for sale. ALBORNOZ then sent pictures of the firearms to the ███ Finally, ALBORNOZ advised he would be willing to drive the firearms to Colorado in exchange for an extra $700, to which ███ and Denver UC agreed.

c.     On or about October 28, 2025, ATF Denver conducted an undercover operation in which the Denver UC and ███ purchased two firearms from ALBORNOZ who, based on court-authorized location information, transported the firearms from the Middle District of Tennessee to Denver, Colorado. The Denver UC paid ALBORNOZ $3,100—$1,200 per firearm plus $700 for driving them to Denver. The firearms purchased by the Denver UC on October 28, 2025, are: 1) an FNH USA LLC Model 509 9mm caliber pistol, bearing serial number GKS0006819; and 2) a Smith & Wesson Model M&P 380 Shield .380 caliber pistol, bearing serial number RHV1548.

d.     On or about January 12, 2026, ATF Ft. Lauderdale conducted an operation in which ALBORNOZ brokered the sale of approximately 90 grams of cocaine for $3,000 from his associate E.R. ("ER") to an ATF Ft. Lauderdale UC ("Ft. Lauderdale UC"). In exchange for brokering the narcotics transaction, ALBORNOZ received a fee of $200 that was sent to an account under CD's name (similar to what happened following Yakima deal

involving BAZA on December 22, 2025). In advance of the transaction, ALBORNOZ communicated with ▮ regarding the specifics of the transaction, including the location where the deal would take place. Further, ALBORNOZ was on the phone with others during the transaction. According to DEA lab analysis, the white substance seized on January 12, 2026, tested positive for Cocaine Hydrochloride, with a total net weight of approximately 83.9 grams.

e.   On or about January 14, 2026, ALBORNOZ brokered a deal for ▮ and the Denver UC to purchase approximately three ounces of cocaine from his associates in Denver—M.D. ("MD"), J.B.R. ("JBR"), and EMP. The parties agreed that Denver UC would pay $3,200 for the cocaine and an additional $200 to ALBORNOZ for brokering the deal. During portions of the transaction, ALBORNOZ was on speakerphone and/or a video call with ▮ The white substance purchased field-tested positive for cocaine and weighed approximately 85.5 grams.

f.   On or about January 14, 2026, ATF Indiana conducted an undercover operation in which an Indiana undercover agent ("Indiana UC") and a ▮▮▮ ("▮ purchased one firearm—a Stoeger, model STR-C, 9mm handgun with an attached laser beam bearing serial number 6249-22S04344—from E.P. ("EP"), an associate of ALBORNOZ, in exchange for $1,200. The transaction was arranged by ALBORNOZ who was communicating with ▮ and ▮ over WhatsApp. ALBORNOZ sent a photograph of the firearm to ▮ in advance of the deal. Additionally, during the transaction, ALBORNOZ was on a video call with EP wherein ALBORNOZ advised that the price for the firearm would be $1,200 and an extra $80 would be paid to EP for delivering the firearm.

g. On or about January 21, 2026, ATF Denver conducted an operation in which ALBORNOZ brokered the sale of two firearms to ███ and the Denver UC through his associate GY. The undercover purchase included a payment of $2,200 for both firearms, an additional payment of $100 to GY for gas and transportation fees for obtaining the firearms and transporting them to the undercover location, and an additional payment of $200 to ALBORNOZ for arranging and brokering the firearms transaction and introducing GY to the Denver UC. The firearms purchased by the Denver UC on January 21, 2026, were: 1) a Polymer 80 Inc. Model PF940V2 9mm caliber pistol, bearing serial number NV310; and 2) a Glock Model 30 .45 caliber pistol, bearing serial number WUU864. Based upon NIBIN results, the Polymer 80 Inc. 9mm pistol was preliminarily associated with one homicide, one attempted homicide, and one shots-fired call for service. Additionally, the Glock Model 30 .45 caliber pistol traced back to a Federal Firearms Licensee ("FFL") burglary that occurred on December 27, 2025. According to information provided by an ATF Special Agent in Denver, the December 27, 2025, the FFL burglary was part of a string of connected FFL burglaries that occurred in Colorado in December 2025. A total of approximately 75 firearms were stolen during those FFL burglaries. Investigators have conducted custodial interviews of multiple individuals suspected to be involved in one or more of those FFL burglaries. At least one of the interviewed suspects identified the FFL burglaries as being ordered by a person who the suspect identified as a member of TdA in Denver.

h. On or about January 21, 2026, ATF Indiana conducted an undercover operation in which ALBORNOZ brokered a deal for the Indiana UC and ███ to purchase four firearms and Tusi from EP in exchange for $4,400 and $2,100, respectively. During

the deal, EP placed a video call to ALBORNOZ who reiterated the prices for the firearms and Tusi. The four firearms purchased were: 1) a Privately Manufactured Firearm, model PF940C, 9mm handgun without a serial number; 2) a Smith & Wesson, model SD9VE, 9mm handgun bearing serial number FBV0704; 3) a Canik55, model TP-9SF, 9mm handgun bearing serial number T647220AT1253; and 4) a Star, model Firestar, 9mm handgun bearing serial number 1959604. Agents conducted database queries and discovered the Smith & Wesson pistol was previously reported stolen. The suspected Tusi had a gross weight of approximately 45 grams.

     i.     On or about February 11, 2026, ALBORNOZ brokered a deal for ███ and the Denver UC to purchase approximately three ounces of cocaine from GY, his associate in Denver, in exchange for $6,600, which included $200 to GY and $400 to ALBORNOZ. While ALBORNOZ was not physically present during the deal, he was on a video call with the ███ the Denver UC, and GY during the transaction. The white powdery substance field tested positive for cocaine and weighed approximately 180 grams.

     j.     On or about February 13, 2026, ATF Ft. Lauderdale conducted an undercover operation in which ALBORNOZ brokered a deal whereby the Ft. Lauderdale UC would purchase four ounces of cocaine in exchange for $4,000 and a Glock 23 .40 caliber pistol, bearing serial number NMT483, in exchange for $1,300 from his (ALBORNOZ's) associate S.C. ("SC"). The Ft. Lauderdale UC communicated directly with ALBORNOZ during this transaction over recorded communications. According to DEA lab analysis, the white substance tested positive for Cocaine Hydrochloride, with a net weight of approximately 110.3 grams.

     k.     On or about March 12, 2026, ATF Ft. Lauderdale conducted an undercover

operation in which ALBORNOZ brokered a deal whereby the Ft. Lauderdale UC would purchase 50 MDMA pills and two ounces of Tusi in exchange for $3,500 from his (ALBORNOZ's) associate SC. The Ft. Lauderdale UC communicated directly with ALBORNOZ during this transaction over recorded communications. ALBORNOZ asked to be sent $100 following the deal. According to DEA lab analysis, the 50 MDMA pills tested positive for 3,4-Methylenedioxymethamphetamine ("MDMA"), methamphetamine, and caffeine with a net weight of approximately 25.01 grams. Additionally, the Tusi tested positive for ketamine, 3,4-Methylenedioxymethamphetamine ("MDMA"), and caffeine with a net weight of 57.34 grams.

l.      On or about April 1, 2026, ATF Ft. Lauderdale conducted an undercover operation in which law enforcement seized 50 MDMA pills, approximately nine ounces of cocaine, and a Canik TP9 Elite Pistol bearing serial number 23CB12192 from SC—one of ALBORNOZ's associates. The Ft. Lauderdale UC communicated directly with ALBORNOZ during this transaction over recorded communications. The narcotics were field tested using the TruNarc narcotics analyzer which yielded positive results. The cocaine weighed approximately 263 grams and the MDMA pills weighed approximately 28 grams. This meeting was coordinated by ALBORNOZ.

**J.   Defendants' Status to be in the United States:**

54.    ALBORNOZ is a citizen of Venezuela who unlawfully entered, and admitted to illegally entering, the United States near El Paso at a time and place other than as designated by the DHS Secretary.

55.    VELASQUEZ is a citizen of Venezuela who entered, and admitted to entering, the United States illegally on or about August 8, 2022, after crossing the Rio Grande River near Eagle Pass, Texas.

56.     MARQUEZ is a Legal Permanent Resident originally from Honduras. On or about October 29, 2025, MARQUEZ received an Order of Deferral (Judicial Diversion) after pleading guilty to Felony Reckless Endangerment with an offense date of on or about January 9, 2025. MARQUEZ received a sentence of 18 months, beginning on October 29, 2025, and ending on April 29, 2027.

57.     BAZA was born in Venezuela and is presently a citizen of Colombia who entered, and admitted to entering, the United States illegally on or about July 31, 2023, near Tecate, California.

## CONCLUSION

58.     Based upon the facts above, I submit there is probable cause to believe the following:

a.     ALBORNOZ has committed violations of Title 21, United States Code, Sections 841 and 846 - Drug Trafficking Conspiracy Involving More than 500 Grams of Cocaine and Other Controlled Substances; Title 18, United States Code, Section 924(c) - Using and Carrying a Firearm During and In Relation to a Drug Trafficking Crime; and Title 18, United States Code, Section 933 - Firearms Trafficking Conspiracy;

b.     VELASQUEZ has committed a violation of Title 18, United States Code, Section 933 - Firearms Trafficking Conspiracy;

c.     MARQUEZ has committed a violation of Title 18, United States Code, Section 933 - Firearms Trafficking Conspiracy; and

d.     BAZA has committed a violation of Title 21, United States Code, Sections 841 and 846 - Drug Trafficking Conspiracy Involving More than 500 Grams of Cocaine and Other Controlled Substances.